CHANG | KLEIN LLP
DEBORAH S. CHANG, CA State Bar No. 246013
  deborah@athealaw.com/ deborah@changklein.com
Telephone: 310.421.0011
Facsimile: 310.861.1918
44 Hermosa Avenue
Hermosa Beach, CA 90254

McGINN, MONTOYA, LOVE & CURRY, PA
RANDI McGINN, NM State Bar No. 1753
  randi@mcginnlaw.com
Telephone:  505.843.6161
201 Broadway Blvd. SE
Albuquerque, NM   87102

LITTLEPAGE BOOTH
ZOE LITTLEPAGE, TX State Bar No. 12430050
  zoe@littlepagebooth.com
Telephone: 713.529.8000
1912 West Main Street
Houston, TX 77098

FRANK PENNEY INJURY LAWYERS
FRANK PENNEY, CA State Bar No. 176170
  frank@penneylaw.com
JOSHUA BOYCE, CA State Bar No. 270444
  joshua@penneylaw.com
1544 Eureka Road, Suite 120
Roseville, CA 95661
Telephone: (916)788-1960
Fax: (916)788-1970

Attorneys for Plaintiffs Ludovic Michaud, Christine
Namagembe and John Bosco Kateregga

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| LUDOVIC MICHAUD, an individual, CHRISTINE NAMAGEMBE, an individual and JOHN BOSCO KATEREGGA, an individual;<br><br>          Plaintiffs, | Case No.      1:21-CV-01567-KLM<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>**1.  NEGLIGENCE *PER SE* (FEDERAL TORT CLAIMS ACT, 28 U.S.C. §§ 1346(b), 2671-2680 )**<br><br>**2.  NEGLIGENCE (FEDERAL** |

vs.

UNITED STATES, a government entity

Defendant.

**TORT CLAIMS ACT, 28 U.S.C. §§ 1346(b), 2671-2680 )**

**3.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (FEDERAL TORT CLAIMS ACT, 28 U.S.C. §§ 1346(b), 2671-2680 )**

**4.  LOSS OF CONSORTIUM OF LUDOVIC MICHAUD  (FEDERAL TORT CLAIMS ACT, 28 U.S.C. §§ 1346(b), 2671-2680 )**

Plaintiffs LUDOVIC MICHAUD, an individual, CHRISTINE NAMAGEMBE, an individual and JOHN BOSCO KATEREGGA, an individual, allege on information and belief:

## INTRODUCTION

1.     Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA bring this action against Defendant for the wrongful death of Esther Nakajjigo on June 13, 2020.

2.     LUDOVIC MICHAUD claims negligent infliction of emotional distress damages for witnessing the horrific death of his wife on June 13, 2020.

3.     Plaintiff LUDOVIC MICHAUD claims loss of consortium for the loss of his wife on June 13, 2020.

## PARTIES

4.     At the time of the wrongful death, Plaintiff LUDOVIC MICHAUD, was a resident of the State of Colorado, County of Denver.   LUDOVIC

2

MICHAUD was the husband of Esther Nakajjigo, who was also a resident of the State of Colorado, County of Denver, at the time of her death.

5.      At the time of the wrongful death, Plaintiff CHRISTINE NAMAGEMBE was a resident of Uganda.  CHRISTINE NAMAGEMBE is the mother of Esther Nakajjigo.

6.      At the time of the wrongful death, Plaintiff JOHN BOSCO KATEREGGA was a resident of Uganda.  JOHN BOSCO KATEREGGA is the father of Esther Nakajjigo.

7.      Esther Nakajjigo was born on April 16, 1995, and was 25 years old at the time of her death on June 13, 2020 at Arches National Park in Utah.

8.       Defendant UNITED STATES is a government entity organized and existing under the laws of the United States of America.  Defendant UNITED STATES owned, operated and controlled Arches National Park, which was operated by the UNITED STATES NATIONAL PARK SERVICES ("NPS").

9.      At the time of Esther's death NPS acted through its agents or employees, whose negligent acts or omissions occurred while in the course and scope of their employment with the NPS for the purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 (hereinafter, "FTCA") of Defendant UNITED STATES.

10.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of DOES 1 through 10, inclusive, are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names.  The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiffs. Plaintiffs are informed and believe and thereon allege, that each of the Defendants designated herein as a DOE was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally and proximately caused the hereinafter described injuries and damages to Plaintiffs.  Plaintiffs may seek leave of the Court to amend this Complaint (hereinafter, "COMPLAINT") to show the Defendants' true names and capacities after the same have been ascertained. Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendant and DOES 1 through 10, inclusive, and each of them, were agents, servants, employees, successors in interest, and/or joint venturers of their co-Defendants, and were, as such, acting within the course, scope, and authority of said agency, employment, and/or venture, and that each and every Defendant, as aforesaid, when acting as a principal, was negligent in the selection and hiring, training, and supervision of each and every other Defendant as an agent, servant, employee, successor in interest, and/or joint venturer.

4

## **JURISDICTION AND VENUE**

11.     This Court's jurisdiction over Plaintiffs' claims against Defendant

UNITED STATES arises under the Federal Question Statute, 28 U.S.C. §1331 and

the Federal Tort Claims Act (FTCA), 28 U.S.C §1346.   The wrongful death

damages in this case exceed $75,000.

12.     Venue in this judicial district is proper under 32 CFR § 750.32

because this is the judicial district in which plaintiff LUDOVIC MICHAUD

resides.

13.     Plaintiffs LUDOVIC MICHAUD**,** CHRISTINE NAMAGEMBE, and

JOHN BOSCO KATEREGGA each filed their own independent Administrative

Claim, Form 95, for damage, injury or death on October 22, 2020, with United

States of America, Department of the Interior, U.S. National Park Service, Arches

National Park.  The NPS has failed to respond to Plaintiffs' Administrative Claims

within the designated six months. Therefore, Plaintiffs LUDOVIC MICHAUD**,**

CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA each timely file

this COMPLAINT for Damages.

14.     The applicable substantive law is Utah statutory and common law

Code, the venue in which the wrongful death occurred.

## GENERAL ALLEGATIONS

15.     Three months into the Covid-19 pandemic in early April, 2020, almost all of the largest 62 National Parks were closed with locked gates because of public safety concerns.

16.     On April 22, 2020, only a week after the last big-name park was closed, the President of the United States announced that the national parks would be re-opening.

17.     Upon information and belief, many American citizens and members of the National Park Service warned that such a quick re-opening of public parks would endanger public safety, not just because of the pandemic, but because of cuts in funding for the park service and a reduction in trained NPS employees to safely re-open the parks.

18.     In response to public and internal safety concerns, the NPS and park representatives promised that the safety and health of visitors would be the most important factor guiding the re-opening process.

19.     Arches National Park in Utah re-opened on May 29, 2020, right after the normally busy Memorial Day weekend.   On its first day open, the understaffed

park was overwhelmed by the number of people entering the park and closed the gates at 9:10 a.m., just 3 hours after guests began arriving.

20.     The entrance/exit gates used to close Arches National Park were made of heavy metal pipes, in a triangular shape with spear-like sharp ends.



*Photo of incident gate from 2013*

21.     Over the decades the National Park Service (NPS) has used these metal spear-like gates in many of America's national parks. The NPS has learned that, when left unsecured, these gates can unexpectedly swing into the traveled part of the roadway and pierce or penetrate into vehicles like a lance, injuring or endangering the lives of the passengers inside.

22.     In order to keep the traveling public safe on the roadways in our national parks, when these metal spear-like gates are opened, they must be secured

to a metal pole, called a "gate keeper" or a "receiver post", with a lock.   The lock can be purchased for $8.



Photograph of incident Stop Sign gate in May of 2013 shows the necessity of a padlock to secure the swing gate to the receiver post

23.     An unsecured gate is even more dangerous to the traveling public if it is in a location where there is abundant wind.  It is well known that Arches National Park has abundant winds which some experts believe contributed to the formation of the very arches of the National Park.

24.     The NPS and Arches National Park managers, agents and employees knew or should have known that the winds in the area were strong enough to blow an unrestrained metal pipe gate into the path of an oncoming vehicle.

25.     Despite this knowledge, approximately two weeks before June 13, 2020, the NPS, through its agents and employees, opened the entrance gate to

Arches National Park and did not secure the metal spear-like end of the gate to the receiving post with a lock.  In the intervening two weeks, no one noticed and the gate remained unsecured. Pursuant to Utah law, the fact that the NPS and its employees created this unsafe condition makes the notice requirement, inapplicable.

26.    On June 13, 2020, at or around the time of the subject incident, Windspeeds at Arches National Park were recorded at approximately or over 25 MPH.

## Esther Nakajjigo

27.    Esther Nakajjigo, "Essie" to her friends and family, was born in Kampala, Uganda.  At the age of 25, she had accomplished more than most people do in an entire lifetime and had much more to do with her life.

28.    When she was 17, Essie donated her university tuition money to start a private, not-for-profit community health center that she named the Princess Diana Health Centre. The Center, among other services, provided free adolescent reproductive health care to young girls between the ages of 10-24 years old.

29.    Essie's desire and commitment to make the world a better place moved others to donate money, beds, microscopes, computers and medical supplies for the Centre to improve the health and wellbeing of her fellow

Ugandans.  The United Nations Population Fund awarded her a Woman Achiever Award at the age of 17.  At the awards ceremony, Essie was named Uganda's Ambassador for Women and Girls – a title she proudly bore until her death.

30.    Essie used her growing fame to bring attention to child mothers and the prevalence of teen girls leaving school because of poverty or pregnancy. She created a reality TV Show to highlight this problem which became Uganda's most popular show.  Essie became one of her country's most beloved television stars.

31.    Essie was selected in 2018 to become a United States Department of State Young African Leader and obtained the Mandela Washington Fellowship for Young African Leaders. In that same year, she was selected as one of only 16 Young Leaders worldwide (out of 8,000 applicants) to attend the 2018 European Development Days in Brussels as a European Commission Young Leader. While there, Essie's inspirational speech caused Uganda to be selected as one of the seven countries in which a Spotlight Initiative was to be piloted. Because of her work, the Spotlight Initiative, aimed at ending gender-based violence against women and girls, began in March of 2020 in Uganda.



32.     In 2018, Essie was offered a full scholarship to attend the prestigious

Watson Institute in Boulder, Colorado. She began the program in January of 2019.

Watson Institute is an accelerator program designed to advance the careers of social

entrepreneurs through training, intensive mentorship, and creation of a global

network and community of peers. Its alumni and scholars have created businesses

hiring over 800 employees, impacting over 150,000 people world-wide and have

raised over $100 million in donations and funding.  Not surprisingly, she excelled

at Watson. At the end of the program, Essie won the grand prize for the best

initiative.

33.     Throughout her adulthood and at the time of her death, Essie supported her mother and father and planned to continue to do so until the time of their deaths.

34.     To Essie, Boulder, Colorado and the United States represented a bright new opportunity to make money and expand her ability to positively impact the world.

35.     And then something extraordinary and unexpected happened: Essie met Ludovic (Ludo) Michaud.   A Solution Architect for a multimedia technology company, and an accomplished musician, Ludo had moved to Colorado from Paris, France. When he first met her, Ludo had no idea Essie was a Ugandan television star who was used to the red carpet and being recognized wherever she went in her home country.  Ludo just knew that her charisma, work ethic and compassion were intoxicating.



36.     These two people from different parts of the world met and fell madly in love in Boulder. They enjoyed exploring their new city and country – including the local and national parks. Together, they planned a future in which Essie would transition into the business/entertainment/influencer world to self-fund her charitable work and continue her projects.  Ludo would be by her side.

37.     In March 2020 the couple decided to get married and they tied the knot at one of the only courthouses still open during the pandemic.

38.     When they heard that Arches Park had re-opened, the newlyweds decided to visit the park.

## <u>The Fateful Trip to Arches National Park on June 13, 2020</u>

39.    For Essie and Ludo, the weekend excursion to Utah was a welcome break after months of pandemic lockdown.

40.    Ludo had purchased an "America the Beautiful" annual national park pass for $80.  On Saturday, June 13, 2020, he presented the pass to the Arches park ranger upon their arrival.

41.    After touring the park, at approximately 1:48 p.m., the couple drove their vehicle on the only roadway out of the park. Suddenly, and without warning, the unsecured Stop Sign metal gate was caught by the wind and swung into the roadway, directly into their car's path of travel.

42.    The end of the lance-like gate pierced the passenger side of their car, impaling and severing Essie Nakajjigo's head and face from her body, fragmenting her brain into pieces, and mangling her right arm from shoulder to fingers.



43.     In the driver's seat, Ludo was instantly covered with blood and looked over to find his wife decapitated.

44.     The repercussions from Essie Nakajjigo's death reverberated throughout the world, and condolences poured in, including from 52 world leaders. Two different funeral services were held in Uganda, and a street was re-named Princess Essie Avenue to honor her, as she was dubbed the country's "Princess of Hearts."

<u>**COUNT I**</u>

**NEGLIGENCE *PER SE* (FTCA)AGAINST ALL DEFENDANTS**

All previous paragraphs are incorporated herein.

45.     Defendant United States through the NPS is negligent *per se* for violating the standards set out in the National Manual on Uniform Traffic Control Devices (23 C.F.R. § 655.603).

**National MUTCD 23 C.F.R. § 655.60**

46.     The national standard for all traffic control devices installed on any roadway open to public travel is set forth in 23 C.F.R.§ 655.603, the National Manual on Uniform Traffic Control Devices (MUTCD) approved by the Federal Highway Administrator ("FHA").  In a 1973 Memorandum of Understanding between the NPS and the FHA, as amended and modified in 2006, agreed that "**[a]ll NPS roads open to public travel will be in <u>full</u> compliance with the MUTCD** unless otherwise stated below" (emphasis added).

47.     Pursuant to the MUTCD, any manually operated gate installed and operated under authorization of a public agency to control traffic on public roadways is a traffic control device.[1]

---

[1] MUTCD Section 1A.13 Definitions – 79. Gate.

48.     The NPS had the responsibility for the proper design, placement, maintenance and operation of the entrance/exit gate.[2] This included **maintenance** required to ensure proper functioning of **all** aspects of the gate arms, including the **locking mechanisms**.[3] The MUTCD requires that the responsibility for the **competent** maintenance of the gate **and all of the necessary appurtenances "be clearly established"** before installation (emphasis added).[4]

49.     The National MUTCD, Section 2B.68 on "Gates", specifies that "[w]hen gate arms are . . . rotated in the **open position**, the closest part of the gate arm and support **shall have a lateral offset of at least two feet from . . . the edge of the traveled way**" (emphasis added). This mandatory requirement **prohibits an unsecured gate** arm from swinging into the traveled way of a roadway when in the open position.  To comply with this statute, a swing gate that is kept in the open position must have an appropriate locking device.[5]

50.     The National MUTCD Gates section 2B.68 also provides that "[w]hen a gate that is **rotated in a horizontal plane** is in the position where it is parallel to

---

[2] MUTCD Section 1A.07 Responsibility for Traffic Control Devices.

[3] *See* MUTCD Section 1A.05 Maintenance of Traffic Control Devices.

[4] MUTCD Section 4D.02 Responsibility for Operation and Maintenance.

[5] The International Property Maintenance Code, also adopted by the United States General Service Administration, requires in section 304.19 that all exterior gates be maintained in good condition, and that such gates are secured.

traffic (indicating that the roadway is **open**), the outer end of the gate arm should be **rotated to the downstream direction** (from the perspective of the traffic in the lane adjacent to the gate support) **to prevent spearing** if the gate is struck by an errant vehicle" (emphasis added).

51.     In violation of this section, the Arches Stop Sign gate opened in the wrong direction.  The gate opened directly into oncoming traffic.

52.     In addition, the National MUTCD Gates section 2B.68 provides that gate arms "shall be fully retro-reflectorized on both sides" with alternating red and white vertical stripes at 16-inch intervals. Because the gate arms and support also constitute obstructions on the side of the roadway, object markers should have been placed on the gate arm and support pursuant to section 2C.65 Object Markers for Obstructions Adjacent to Roadway.



53.     In violation of this section, the Arches gate was made practically invisible to the traveling public by being painted adobe brown causing it to blend into the background.

54.     The MUTCD provides in **section 4D.01** that when a traffic control signal was not in operation, such as during seasonal shutdowns, the signal faces should be "turned or taken down." The subject entrance gate, and its attached STOP sign (on one side of the road) and ROAD CLOSED sign (on the other side of the road) had not been in operation for weeks and rarely are in operation at Arches National Park.

55.     In violation of this section, the NPS did not remove the signs from the swing gates which allowed those signs to create a sail-like effect and accelerated the movement of the gates when the wind blew.

56.     The NPS, through its agents or employees, was negligent *per se* in its maintenance and use of the Arches entrance/exit swing gate in one or more of the following ways:

   a.     Violating the requirement that an open gate be secured by a locking mechanism;

   b.     Choosing not to fix the gate so it opened in the correct way and could not impale oncoming traffic;

c.      Painting the gate adobe brown, rather than red and white so it was camouflaged and difficult for the traveling public to see; and

d.      Violating the provision that signs should be removed from swing gates when not in use to prevent them from being blown into traffic by the wind.

57.     As a legal, direct and proximate cause of the negligence per se of the Defendant United States, the government created with the Arches gate a lethal and undetectable danger for the unsuspecting motorists who visited the park, and which on June 13, 2020, turned a metal pipe into a spear that went straight through the side of a car, decapitating and killing Esther Nakajjigo.

58.     As a legal, direct and proximate result of the negligence *per se* of Defendant UNITED STATES and DOES 1 through 10, Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA have suffered damages resulting from the loss of past and future love, compassion, society, comfort, pleasure, advice, care, protection, and affection of their wife and daughter, Essie Nakajjigo, all to their general damages in a sum that will be proven at trial.

59.     As a legal, direct and proximate result of the negligence *per se* of Defendant UNITED STATES and DOES 1 through 10, Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA

and the world will be deprived of the financial support and assistance of their wife and daughter Essie Nakajjigo, the exact amount of such losses to be proven at trial.

60.     As a legal, direct and proximate result of the negligence *per se* of Defendant UNITED STATES and DOES 1 through 10, Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA have incurred property, funeral and burial expenses in an amount to be proven at trial.

## COUNT II

## CLAIM FOR NEGLIGENCE (FTCA) AGAINST ALL DEFENDANTS

All previous paragraphs are incorporated herein.

61.     Defendants owed a duty of reasonable care to keep safe all visitors to the National Parks and to follow and meet the standards set out by the National Park Service Management Policy Manual.

62.     The NPS Management Policy Manual (2006) specifies that **the saving of human life takes precedence over all of its management actions so as to protect human life and provide for injury-free visits. The NPS "will strive to identify and prevent injuries from recognizable threats to the safety and health of persons . . . by applying nationally accepted codes, standards, [and] engineering principles"** (*emphasis added*).

21

63.     Federal agencies, including the NPS, are required to use standards developed by voluntary consensus standards organizations like the American Society for Testing and Materials (ASTM) International and other federal agencies. See the National Technology Transfer and Advancement Act of 1995, 15 U.S.C. § 3701 et seq., and the Office of Management and Budget Circular No. A-119, Federal Participation in the Development and Use of Voluntary Consensus Standards.

64.     All of the relevant industry standards relating to metal swing gates require the construction **and use** of a gatekeeper or receiver post and that gates be secured or locked when in the open position.

65.     In order to prevent the impaling of vehicles, the ASTM F 900-11 Standard Specification for Industrial and Commercial Steel Swing Gates requires that swing gates have gate keepers which "**shall** consist of a mechanical device for securing the free end of the gate when in full open position."    Paragraph 6.6 specifies that keepers (or receiver posts) shall be provided for each gate leaf over 5 feet wide, and that "[g]ate keepers shall consist of a mechanical device for securing the free end of the gate when in full open position" (emphasis added).   The use of the word "shall" in ASTM specifications "is used to indicate that a provision is mandatory."

66.     Because the Arches gate consisted of two gate leafs over 5 feet wide, to comply with  the mandatory ASTM standards, each leaf had to have (and use) a keeper with a mechanical device (such as a latch, lock or a chain and padlock) for securing the free end when the gate was open.

67.     The United States Department of Agriculture Forest Service created a manual entitled "Vehicle Barriers:  Their Use and Planning Considerations."  This manual details specifications and requirements for virtually every kind of manual swing gate and all of them require a locking mechanism to secure each gate arm to the receiver post.

68.     The same is true for gate and barrier specifications promulgated by the United States Army and Navy for use on their bases.  The Military Handbook for Design Guidelines for Security Fencing, Gates, Barriers and Guard Facilities published by the United States Department of Defense specifies that all such gates be provided with locking hardware, including a padlock.

69.     Unlike electronic gates, manual horizontal swing barriers require human intervention to ensure they are regularly maintained, inspected and locked when in the open or closed positions.   All of the standards and specifications detail that the installing agency must ensure that maintenance, inspection and locking occurs.

70.     The NPS and Arches National Park employees and personnel did not have any discretion or judgment with respect to securing the metal entrance/exit gates because federal statutes, regulations, and its own policies specifically require such safety actions of all employees and personnel.

71.     In violation of its duty of reasonable care for safety and in violation of federal standards, design manuals, civil engineering standards, gate industry standards, NPS specification and/or their own established protocols, policies and procedures for metal swing gates, the Defendants, through their agents and employees were negligent in one or more of the following ways:

  a. Inappropriately constructing and / or installing the Arches metal pipe Stop Sign gate, including installing the gate so that it swung into oncoming traffic if blown by the wind and not providing sufficient markings on the gate to ensure it was easily visible to motorists;

  b. Not providing or implementing a locking mechanism on the gate receiver post to ensure the gate arm was secured when the gate was in the open position, including a padlock, chain or lock or latch;

  c. Not regularly inspecting or maintaining the gate equipment to ensure the gate was locked at all times when in the open position, including in the two weeks the park was open before June 13, 2020;

  d. Not properly training, monitoring, or supervising park personnel to ensure that the gate was locked and restrained when in the open position;

  e. Not taking appropriate precautions or measures to remedy, guard against, or eliminate the dangerous condition even though they knew or

reasonably should have known about the dangers posed by unlocked metal pipe gate arms;

       f.     Creating an unsafe, dangerous condition that was undetectable to drivers, and then placing it in close proximity to the visitor center on a much traveled roadway where strong winds were common; or

       g.     Not securing the gate arm while it was in the open position, which allowed it to swing into the path of travel of Essie and Ludo's car in such a way that the driver was unable to see it as he drove towards it.

72.    Defendant UNITED STATES created an inherently dangerous and unsafe condition, in a much traveled area leading to the death of Essie Nakajjigo.

73.    Further, Defendant failed to use reasonable care with respect to this danger on its property that Defendant UNITED STATES and/or its Employees created and was known about by Defendant UNITED STATES and/or its employees at ARCHES prior to the death of Essie Nakijjgo.

74.    Defendants' negligent conduct directly and proximately caused the death of Essie Nakajjigo and the resulting injuries and damages suffered by Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA.

75.    As a legal, direct and proximate result of the negligent conduct of Defendant UNITED STATES and DOES 1 through 10,  Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA

have suffered damages resulting from the loss of past and future love, compassion, society, comfort, pleasure, advice, care, protection, and affection of their wife and daughter, Essie Nakajjigo, all to their general damages in a sum that will be proven at trial.

76.     As a legal, direct and proximate result of the negligent conduct of Defendant UNITED STATES and DOES 1 through 10, Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA will be deprived of the financial support and assistance of their wife and daughter Essie Nakajjigo, in an amount to be proven at trial.

77.     As a legal, direct and proximate result of the negligent conduct of Defendant UNITED STATES and DOES 1 through 10, Plaintiffs LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA have incurred property, funeral and burial expenses in an amount to be stated according to proof.

## COUNT III
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (FTCA) ON LUDOVIC MICHAUD AGAINST ALL DEFENDANTS

Plaintiff incorporates all previous paragraphs.  restates and incorporates herein by reference each and every allegation and statement contained in the prior paragraphs.

78.     Esther Nakajjigo was the soulmate Ludo Michaud had been looking for all of his life.

79.     As a legal, direct and proximate result of the negligent or negligent per se conduct  of Defendant UNITED STATES and DOES 1 through 10, Plaintiff Ludo Michaud was immediately next to and witnessed the death of his wife, including the severing of his wife's head and face from her body, the fragmenting of her brain into pieces as it fell into her lap, and the mangling of her right arm from shoulder to fingers.

80.     With both her carotid arteries severed, Essie's blood spewed and sprayed everywhere in the car. Ludo was literally drenched from head to toe in her warm blood. He will never forget the metallic smell of the blood. Ludo had to remain in his blood-soaked clothes for the rest of the day and all night until he returned to Colorado. He cleaned his wife's blood and brain matter out of his ears the next

morning.

81.     As a direct result Ludo Michaud  suffered severe emotional distress.

82.     As a result of his severe emotional distress from witnessing the severing of his wife's head from her body, Ludo Michaud was injured and hurt in his health, strength and activity, sustaining serious injuries to his body, and shock and injury to his nervous system and person, all of which said injuries have caused and continue to cause Ludo Michaud  great physical and mental pain and suffering.  Those injuries will result in some permanent disability to Ludo Michaud in an amount which will be proven at trial.

83.     As a legal, direct and proximate result of the negligent or negligent *per se* conduct of Defendant  UNITED STATES and DOES 1 through 10, Plaintiff Ludo Michaud  was compelled to and did employ the services of hospitals, physicians, therapists, nurses and the like, to care for and treat him, and did incur hospital, medical, professional and incidental expenses, and he will necessarily incur additional like expenses for an indefinite period of time in the future, the exact amount of which expenses will be proven at trial.

## <u>COUNT IV</u>
## <u>LOSS OF CONSORTIUM OF LUDOVIC MICHAUD</u>
## <u>AGAINST ALL DEFENDANTS</u>

All previous paragraphs are incorporated herein.

84.     Plaintiff LUDOVIC MICHAUD and Esther Nakajjigo were married at the time of her death.

85.     Plaintiff LUDOVIC MICHAUD and Esther Nakajjigo were soulmates and shared a close, loving, supporting, and mutually dependent spousal relationship.

86.     It was foreseeable that Plaintiff LUDOVIC MICHAUD would be harmed by the death of his wife as a result of the wrongful acts of Defendant UNITED STATES and DOES 1 through 10.

87.     Plaintiff LUDOVIC MICHAUD was harmed by the death of his wife as a result of the acts and omissions of Defendant UNITED STATES and DOES 1 through 10.

88.     The acts and omission of Defendant UNITED STATES and DOES 1 through 10 were negligent, wanton, willful, and/or reckless and legally, directly, and proximately caused Plaintiff LUDOVIC MICHAUD to suffer a loss of consortium.

89.     Defendant UNITED STATES and DOES 1 through 10 are liable for Plaintiff LUDOVIC MICHAUD'S loss of consortium.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendant UNITED STATES and DOES 1 through 10, as follows:

1.     For all available general damages (non-economic damages);

2.     For all available special damages (economic damages);

3.     For attorney's fees as allowable by law;

4.      For costs of suit as awardable by law; and

5.      For such other and further relief as the Court may deem just and proper.

Dated: August 16, 2021                          Respectfully submitted by:



*/s/ Randi McGinn*
Randi McGinn
201 Broadway Blvd. NE
Albuquerque, NM  87102
Ph:  505-843-6161
Fax:  505-242-8227
randi@mcginnlaw.com

-and-

**LITTLEPAGE BOOTH**

*/s/ Zoe Littlepage*
Zoe Littlepage
1912 West Main Street
Houston, TX 77098
Ph.:  713-529-8000
zoe@littlepagebooth.com

-and-

**ATHEA TRIAL LAWS, LLP**
Deborah S. Chang
44 Hermosa Avenue
Hermosa Beach, CA 90254
Ph.:  310-421-0011
deborah@changklein.com

*Attorneys for Plaintiffs*
*Ludovic Michaud,*
*Christine Namagembe, and*
*John Bosco Kataregga*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of August, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Deborah Chang
deborah@athealaw.com

Zoe Littlepage
zoe@littlepagebooth.com

Susan Prose
susan.prose@usdoj.gov

*/s/Randi McGinn*
Randi McGinn