IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LUDOVIC MICHAUD, CHRISTINE NAMAGEMBE, and JOHN BOSCO KATEREGGA,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | **FINDINGS OF FACT AND ORDER**<br><br>Case No. 2:21-cv-00722-BSJ<br><br>Judge Bruce S. Jenkins |

This is a wrongful death case and thus a creature of statute. Plaintiffs are the deceased's surviving husband, Ludovic Michaud and the deceased's surviving parents, Christine Namagembe and John Bosco Kateregga. The Defendant is the United States of America. The case is unusual in a number of ways. The husband is a French citizen, employed in and a resident of the United States. The parents are citizens of Uganda, a poor and heavily populated African nation, formerly part of the British Empire.[1] The deceased, Esther Nakajjigo was a citizen of Uganda, but at the time of her death, a United States resident, newly married to Plaintiff Ludovic Michaud.

The case is unusual as well because the United States has conceded fault – liability to Plaintiffs, as well as causation of the death of Esther Nakajjigo and consequential damages to each of the Plaintiffs. The United States has apologized for its actions and acknowledged that it alone was responsible and emphasized that Mr. Michaud was in no way responsible. The matters before the court are the damages, both economic and non-economic suffered by each of the

---

[1] Uganda is a nation that spans approximately 93,000 square miles, and has a population of approximately 46 million people.

Plaintiffs, resulting from the death of Esther Nakajjigo, for which the United States acknowledges responsibility.

The parties disagree as to a suitable dollar amount for the damages suffered by each of the Plaintiffs. As agreed in the pretrial order adopted by the court, the contested issues of fact remaining for decision are:

> Amount of noneconomic damages owed to each Plaintiff on their wrongful death claims.
>
> Amount of noneconomic damages owed to Mr. Michaud on his claim of negligent infliction of emotional distress.
>
> Amount of economic damages owed each Plaintiff.

Utah Code Section 78B-3-106(4) sates: "In every action under this section and Section 78B-3-105 damages may be given as under all the circumstances of the case may be just." The Utah Supreme Court has identified several elements for the court to consider when calculating damages in wrongful death cases:

> Damage awards in wrongful death cases reflect the loss of the individual plaintiff. *See Switzer v. Reynolds,* 606 P.2d 244, 247 (Utah 1980) (stating that Utah's wrongful death statute compensates the heirs for their individual loss); *In re Behm's Estate,* 117 Utah 151, 159, 213 P.2d 657, 661 (1950) (claiming compensation in wrongful death cases should be proportionate to an individual heir's loss). In assessing damages, the district court must analyze each heir's entitlement under the following elements ordinarily considered in determining the value of the survivor's claim: "financial support furnished; loss of affection, counsel and advice; the loss of deceased's care and solicitude for the welfare of the family; and loss of the comfort and pleasure the family of the deceased would have received." *Switzer,* 606 P.2d at 246; *see also In re: Behm's Estate,* 213 P.2d at 661. We have observed that "the greatest losses arising from the wrongful death of a child are not those losses which are economic in nature. It is the loss of society, love, companionship, protection and affection which usually constitute the heart of the action." *Jones v. Carvell,* 641 P.2d 105, 108 (Utah 1982).

*Oxendine v. Overturf,* 973 P.2d 417 (Utah 1999).

The event of Esther Nakajjigo's death was abrupt. On June 13, 2020, an untethered metal gate used to control highway traffic out of Arches National Park was activated by wind and penetrated the rental car being driven out of the park by Ludovic Michaud in which Esther Nakajjigo, his wife of 2 ½ months, was a front seat passenger. As the car continued to move, the penetrating steel gate pipe struck and instantly killed Esther Nakajjigo. She was decapitated. What remained of her in the front seat and floor of the car was gruesome and overwhelmingly shocking.

The confluence of forces, human and natural, extinguished a life treasured by each Plaintiff with consequential damages to each.

The effort to substitute money for the damages each Plaintiff suffered of a life early and tragically taken from each of them, while always inexact, is the best that can be done in a culture such as ours. The Federal Tort Claims Act and Utah Law govern. The effort is what is "just" under all the circumstances."

Plaintiff Ludovic Michaud, the husband, for all of his claims non-economic, economic and personal asks to be awarded 140,000,000 U.S. Dollars against the United States, of which he seeks $30,000,000 for non-economic damages, $94,787,699 for economic damages, and $35,000,000 for his severe emotional distress.[2]

Plaintiff John Bosco Kateregga, the father, asks to be awarded $1,050,000 U.S. Dollars against the United States for his non-economic and economic damages.

Plaintiff Christine Namagembe, the mother, asks to be awarded $9,500,000 U.S. Dollars against the United States for her non-economic and economic damages.

---

[2] The total of the amounts Plaintiff Michaud seeks for economic, non-economic, and distress damages is $159,787,699, rather than $140,000,000. Plaintiff did not explain this discrepancy.

3

The United States in argument suggests total damages for all plaintiffs at approximately $3,500,000 U.S. Dollars.

The parties joined in a Pretrial Order adopted by the court as set forth in part as follows:

- The end of the gate arm entered the passenger side of the vehicle and struck Ms. Nakajjigo in the head, resulting in her <u>immediate</u> death, and narrowly missed Mr. Michaud. Mr. Michaud immediately exited the vehicle but then reentered the vehicle to put the car in park and stop its forward movement.

- The gate is used by employees of Arches National Park to restrict vehicles from entering the park. The gate consists of two hinged gate arms. When closed, the gate arms span the width of the main roadway leading in and out of the Park. When open, each gate arm is designed to be secured to a receiving post. Park employees were responsible for opening and closing the gate and for securing each gate arm to its respective receiving post. At some point prior to June 13, 2020, however, Park employees opened the gate and secured the inbound gate arm to its receiving post but did not so secure the outbound gate arm.

- Employees of Arches National Park had a duty to exercise reasonable care to protect Mr. Michaud and Ms. Nakajjigo from conditions at the Park that posed an unreasonable risk of harm to them. Park employees also had a duty to reasonably inspect, operate, and maintain the subject gate and specifically to ensure that the gate arms were secured to their receiving posts.

- The unsecured outbound gate arm constituted a dangerous condition that was created by employees of Arches National Park.

- The United States thus breached the duties owed to Mr. Michaud and Ms. Nakajjigo on June 13, 2020, by failing to secure the outbound gate arm to its receiving post.

- This breach was the proximate cause of Ms. Nakajjigo's death on June 13, 2020.

- This breach was the proximate cause of Mr. Michaud's emotional distress arising from the events of June 13, 2020.

- Neither Mr. Michaud nor Ms. Nakajjigo was comparatively negligent in any respect.

- The parties stipulate that the United States is solely liable, under Utah law, for the Plaintiffs' claims of negligence and for Mr. Michaud's claim of negligent infliction of emotional distress.[3]

As previously indicated, Utah Code Section 78B-3-106(4) states: "In every action under this section and Section 78B-3-105 damages may be given as under all the circumstances of the case may be just." The court turns now to those circumstances.

Beginning December 5, 2022, at a trial to the court, the court heard evidence over a period of five days which demonstrated that deceased–from her birth to her 16 year-old, unwed, child mother, living in abject poverty, to the date of her death at age twenty-five–was an unusual person. She was interested in personal accomplishment, in doing good in the world, interested in care, education and opportunity for women and girls in her country of birth and elsewhere. She was selfless as she matured, became best friends with her mother, founded a care center at age 17, raised money for it, provided seed money for it by selling land she had been given by her mother for her own college education, became a reality television personality and raised money for charity, won recognition as a young leader and was designated as Uganda's Ambassador for Women and Girls, a non governmental position.[4] She obtained a full-ride scholarship, paid for by a Colorado charity, to attend the Watson Institute in Colorado to attend a four-month course for budding young world leaders in Colorado. In Colorado, she became acquainted with the man whom she married. Before marriage took place, she returned to Uganda for about three months and came back to the United States to Colorado, reunited with Mr. Michaud, and subsequently they married. She was a graduate of a three-year college in Uganda, and was known nationally from her charitable and T.V. activity there and received recognition with awards and prizes

---

[3] Joint Pretrial Order at 2–3 (ECF No. 79) (emphasis added).

[4] Mr. Jaga testified that the position as ambassador was an honorary title and the Office of the Ambassador for Women and Girls was not a governmental agency. Trial Tr. 79:5–19.

5

monetary and otherwise over a period of years in Africa, Europe and the United States. Though she was interested in charitable endeavors, she was also interested in stylish clothing as shown in some of the videos and photographs show during trial.

The circumstances of Ms. Nakajjigo's marriage to Plaintiff Michaud, though brief, suggest a good and happy marriage with a prospect of the same for a lifetime. Plaintiff Michaud was 27 at the time of marriage and his wife's death. Expressions of love, respect, admiration, the talk of raising at least three children are all circumstances, among other things now lost and incapable of being ever fully replaced. The ability, the energy, and the motivation of his new wife was gone in an instant. One can no longer hold hands, converse, embrace, make plans, look together at the stars, read a book together and discuss its contents, and together go to a movie, cook, camp or travel.

At the time of her death Plaintiff Michaud's life expectancy was fifty years.

The reasonable and just non-economic loss of Esther Nakajjigo to her husband is found by the court to be $7,500,000.

The economic loss to Plaintiff Michaud is of a different nature and is footed on the prospects for future earnings to be contributed by the deceased to the household. Plaintiff Michaud's claim is based primarily upon the opinion of a vocational expert who thought the probabilities of her economic life were based upon her achieving CEO status for an American charity or similar enterprise which would produce multi-millions by way of income. Lacking in the record is a personal history of specific income earned by the deceased either in Uganda or in the United States, other than her part-time job as a hostess in a restaurant. When in the United States, after completing the curriculum at Watson, she worked at a restaurant for $15.00 an hour, until it closed because of the virus. She may have had some income from the Uganda charity,

such as payment for her apartment, but no specific figure has been provided, although the charity spokesman, Mr. Jaga, suggested she could draw down what she needed without ever providing a specific history of amounts.[5] Yet the fact she could use a credit card furnished by the charity, or the charity paid for her apartment, or she could draw down from the charity what she needed, does not obviate the need for specific historic figures as justification to gauge as at least one major significant factor of future economic success.

The government's expert provided figures which provides a more reasonable projection of a median (not average) under all the circumstances of future activity with estimates from $751,892 to $937,917. Ultimately, we know little of Esther Nakajjigo's plans in the United States, whether higher education or direct application in the workforce.

Considering the evidence before it, the court finds the government's expert provides the most persuasive evidence of the appropriate amount of damages stemming from the decedent's lost earnings capacity, though the court makes a modest upward adjustment from the high end to a total of $972,491.97. Funeral expenses of $22,508.03 and the therapy expenses up to date of $5,000.00 are stipulated and acknowledged by the United States. Accordingly, the court finds Plaintiff Michaud is entitled to $1,000,000 in economic damages.

Plaintiff Michaud, as part of his claim, seeks separate damages for his emotional distress which was severe and is enduring. The horror of the event produced obvious and immediate distress for which he received early and ongoing therapeutic counseling. Fortunately, he is making progress in achieving stability and the power to cope with the challenges of life. As indicated, the damages asked for that specific consequence by him is $35,000,000.

---

[5] Mr. Jaga acknowledged the charity commitment to her parents which paid an estimated $1,300 to $1,800 per month for an undetermined time period without beginning point.

The court finds that $1,000,000 is appropriate under all the circumstances for such distress.

Damages awarded to Plaintiff Michaud against the United States is found by the court to total $9,500,000.

The mother, age 41 at the time of deceased's death, has a particular emotional loss of not just a daughter, no longer a child, but an adult, but her best friend and a source directly or indirectly of some support, and the possibility of moving to the United States. As indicated, Esther Nakajjigo became a close friend of her mother and they talked personally or by phone each day, and she contemplated bringing her to the United States, and contributed from her U.S. earnings to her support approximately $300 to $400 per month. Ms. Namagembe's non-economic damage is fixed by the court at $500,000 and her economic loss at $200,000. Her life expectancy was 37.9 years at the time of her daughter's death.

The father, age 51, is less close to his first born and of course older in age. They had settled their differences and become friends. She sent her father some limited financial support prior to her death. Mr. Kateregga's non-economic loss is fixed at $200,000 and his economic loss at $150,000. His life expectancy was 24.3 years at the time of his daughter's death.

Those who testified who had contact with Esther Nakajjigo in her lifetime spoke strongly of her problem-solving abilities, her leadership qualities, and her pleasant and joyful disposition, as well as her intelligence.

Her husband spoke of her association with him, her contribution to the household of the cost of food, her cooking abilities, her concern for her family in Uganda, her daily phone calls to her mother, her calls on occasion to her father, her friendliness to others, her social outreach, and the joy he found in the marriage and contemplation of life together. He spoke also of the fact that

he saw everything at the time of the accident inside and outside the vehicle. He himself was splattered extensively with his wife's blood, as was the interior of the car.

His loss of his contemplated lifetime connection, includes as noted above, such things as sympathy, compassion, conversation, love, companionship, civility, indeed the benefits which flow from a happy marriage. As indicated, they talked of having at least 3 children. There is genuinely no satisfactory metric to measure those losses with precision. One is forced to use the statutory concept of what is "just." The figures presented to the court by Plaintiffs' experts and both based on the testimony of the vocational expert, while plausible, are in the opinion of the court, neither reasonable nor "just."

Let Judgment be entered in the sums set forth below as to the appropriate amounts of damages determined for each of the Plaintiffs:

Plaintiff Ludovic Michaud in the amount of $9,500,000;

Plaintiff Christine Namagembe in the amount of $700,000; and

Plaintiff John Bosco Kateregga in the amount of $350,000.

Dated this 27th day of January 2023.   By the Court:

Bruce S. Jenkins
United States District Judge